(C. D. 1264)

Arthur Jaffe, Inc. *v.* United States

United States Customs Court, Second Division

(Decided August 1, 1950)

*Jordan & Klingaman (Jacob L. Klingaman* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Chauncey E. Wilowski,* special attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Rao, Judge: The two protests listed above raise the question of the proper classification of an importation of certain lithographic prints. The merchandise in question was classified by the collector of customs at the port of New York as manufactures of paper, not specially provided for, and assessed with duty at the rate of 35 per centum ad valorem, pursuant to the provisions of paragraph 1413 of the Tariff Act of 1930. In the protests, the claim was made that the involved articles were dutiable at the rate of 12 cents per pound, as lithographed articles, exceeding twelve and not exceeding twenty one-thousandths of one inch in thickness and more than 35 square inches in cutting size, as provided for in paragraph 1406 of said act. Plaintiff now alleges, however, that as the lithographs are on paper less than twelve one-thousandths of an inch in thickness, they are properly dutiable under said paragraph 1406 at the rate of 30 cents per pound.

Although the latter claim was not specifically stated in the protests, plaintiff contends that it may, nevertheless, be pressed for the reason that the protests properly set forth the paragraph under which the

claim is made. It is argued, therefore, that since the lithographs were stipulated to be less than twelve one-thousandths of an inch in thickness, and more than 35 square inches in cutting size, no other rate than that of 30 cents per pound could possibly apply, if the basic contention of plaintiff that paragraph 1406 covers the merchandise be upheld. With this phase of plaintiff's case we are in entire agreement. See *The George C. Whitney Co.* v. *United States*, 16 Ct. Cust. Appls. 301, T. D. 42874.

The issue on the merits arises by virtue of the fact that said paragraph 1406, which otherwise completely describes the imported merchandise, specifically excludes from its provisions "views of American scenery or objects." The collector being of opinion that the involved prints were in fact views of American scenery held them to be within the exception to the paragraph.

The quoted exception to paragraph 1406 first became a part of our tariff laws with the enactment of the Tariff Act of 1909, and has been repeated without change in each subsequent tariff statute. Very shortly after Congress first employed the language in question, it was the subject of judicial determination in the case of *Raphael Tuck & Sons Co.* v. *United States*, 3 Ct. Cust. Appls. 501, T. D. 33163. It was there held that the words "views of American scenery or objects" meant "only such views as present actual places, buildings, landscapes, or scenes within the United States and not such as are almost entirely produced from the imagination of the artist." The court was there concerned with certain picture postal cards, each of which depicted some event in the life of George Washington. The prints were classified pursuant to the provisions of paragraph 416 of said act of 1909, as views of any landscape, scene, building, place, or locality in the United States.

In reaching the conclusion that it did, the court stated:

\* \* \* The pictures do not profess to represent with accuracy any real locality or actual scene or scenery within the United States; and, indeed, such a representation is obviously impossible in the treatment of their respective subjects.

It may be observed that in paragraph 412 Congress has established a general classification which would include certain of the cards named in paragraph 416, if the first paragraph contained no exception to modify its general terms. However, paragraph 412 contains such an exception, and this was placed in the paragraph for the manifest purpose of making it consistent with the correlative provisions of paragraph 416 now under review. The language of that exception is as follows: "Except \* \* \* views of American scenery or objects \* \* \*." It thus appears from this cognate provision that the word "scene" as used in the one paragraph was intended to be synonymous with the word "scenery" as used in the other. This tends to confirm the court in the conclusion that the views covered by paragraph 412 are only such views as present actual places, buildings, landscapes, or scenes within the United States and not such as are almost entirely produced from the imagination of the artist.

Since paragraphs 1406 and 1410 of the present act contain the same

language as paragraphs 412 and 416 of the 1909 act, we are thus supplied with the test to be employed in determining whether the lithographed prints now before us are views of American scenery or objects. Moreover, in view of the stipulated fact that the instant prints are more than 35 square inches in cutting size they are, of course, excluded from that portion of said paragraph 1410 which provides for "views of any landscape, scene, building, place or locality in the United States, * * * occupying thirty-five square inches or less of surface per view, * * *." Hence, if they are in fact views of American scenery or objects, they were correctly classified by the collector, as manufactures of paper, not specially provided for.

The particular prints here under contention, samples of which were received in evidence at the trial of this case, are "Winter, A View of Monhegan, Maine," by Rockwell Kent (plaintiff's exhibit 1); "Maine Islands," by John Marin (plaintiff's exhibit 2); and "Central Park," by Maurice Prendergast (plaintiff's exhibit 3). There was also offered in evidence as plaintiff's exhibit 4, a catalog entitled "Fine Art Reproductions Old and Modern Masters," published by the New York Graphic Society, which contains a black-and-white reproduction of each of the imported prints.

Two witnesses were called by plaintiff in its effort to establish that the involved prints were not "actual places, buildings, landscapes, or scenes within the United States." As neither of these witnesses was acquainted with the actual locality from which the artists drew their inspirations for their respective paintings, plaintiff endeavored to elicit from them, on the basis of their knowledge of art, opinions concerning the actuality of the scenes depicted.

In this connection, Arthur Jaffe, president of plaintiff company, who has been in the business of publishing, importing, and selling prints for 49 years, testified with respect to exhibit 1 that it was not an actual, faithful reproduction of any particular locality or place. He subsequently modified that statement, however, with the comment that the artist, Kent, "was depicting everything as he saw it without too much imagination; without too much artistic fantasy." With reference to exhibit 2, the witness' comment was that if he saw the landscape, he would not recognize it from the painting. Upon being questioned as to exhibit 3, he stated:

Exhibit 3 was painted in I think about 1890 or so, in Central Park. I don't know if these trees are still there or the horses are there. I know the automobiles are there instead. It also could be Central Park in Sydney, Australia. It could be Central Park in any part of the world and still be a valuable painting.

The witness, August Von Munchhausen, an arrived artist, was of opinion, generally speaking, that a painter does not faithfully reproduce in detail, as does a photographer; that he paints from imagination; and that it is possible for two artists to paint an identical scene

which could be recognized by the finished product of one and not of the other. He stated that he did not think that exhibit 1 was an exact representation of a particular place; that in his opinion the artist, in creating it, was drawing upon his imagination; that exhibit 2 was certainly not an exact reproduction as the artist had created an impression and had used the subject only as an inspiration; and that with respect to exhibit 3, the artist referred to the subject in order to create an idea he had in mind; that is, he was inspired by the particular scene.

Insofar as this witness is concerned, it seems fairly obvious from his conclusions on the subject of painting in general, and from the fact that he admittedly had not made a particular study of any of the artists whose pictures we are considering, that, in characterizing them, he was drawing upon his own experience in the field of art, and his personal reaction to the subjects of his paintings.

An examination of the exhibits before the court reveals that they bridge the gap between what is considered fairly representational art and what, on the other hand, is the product of the so-called impressionistic school. The Rockwell Kent, for example, is so explicit in detail, and accurate in perspective, that any one familiar with the locality of the scene represented on the canvas would instantly recognize it. If it is not a reproduction of the actual locality in the United States, which is indicated by its title, "Winter, A View of Monhegan, Maine," such fact has not been established by the evidence of record. Certainly, very little of the artist's imagination appears to have been injected in varying the landscape painted from the landscape of reality.

This conclusion is borne out by certain observations about the artist which appear in the volume entitled "The Story of Modern Art" by Sheldon Cheney, who is reputed to be an authority on the development of art in the modern era. He stated:

American as Plymouth Rock or his beloved Adirondack Mountains, enamoured alike of the lonely spaces of the Far North and of the impending social revolution, mystic in penetration but declaring flatly for a representational art, Rockwell Kent has been likely in any reckoning to fall between the realists and the anti-realistic moderns. To that extent he has been, for twenty years, one of the independents. Never one of the moderns in placing abstract design before transcription, *never seriously distorting the seen aspect,* he yet has fulfilled that other requirement of the new school, that the artist shall convey the feeling rather than merely the look of the posing person or the contemplated place. He has made revealing and haunting records of the spirit of the Northern lands. * * * [Italics ours.]

The same authority, in considering the artist, John Marin, has this to say:

Most American of the first group of moderns, an exhibitor in 1913, and still an amazing creator twenty-eight years later, John Marin has shown that the ideals

of Whistler, Cézanne, and Seurat may be adopted without commitment to any binding foreign idiom. Like another giant of the American world, Diego Rivera, he went to Europe, absorbed what he wanted from France and from other countries, and returned to form his own unmistakable painting style. Devoted to nature; gaining inspiration from elemental things, sea, mountain, plain and sky; lyrical, even ecstatic in expression, he went further in the years 1910–1940 than any other American in sheer creation, in producing painted equivalents of experienced feeling. Not quite an abstractionist in the absolute sense, he has led all artists on this side of the Atlantic in creative use of abstract form for expressive purposes.

Plaintiff's exhibit 2 is mute but eloquent testimony of the reliability of the author's comments concerning its creator. Though the artist calls his painting "Maine Islands," even the most astute observer would find it difficult to recognize the original site in the painted effusion. While an area in Maine may have served as the inspiration which evoked the artist's desire to create a landscaped view, the resultant painting is clearly the projection of the artist's impression and imagination and not an actual place, landscape, or scene within the United States.

With respect to exhibit 3, the lithograph before us does not reveal in such clear-cut fashion whether it is or is not an actual locality in the United States. We are, at once, confronted, however, with the collector's classification, which establishes presumptively that it does represent a view of an American scene. And the evidence introduced by the plaintiff fails to controvert such finding. Plaintiff's witness Jaffe admitted that the scene represents Central Park, in or about the year 1890, although he did not know whether certain aspects of the scene had altered since the picture was painted. His effort to modify his first statement by saying that it may have been Central Park in some other part of the world is more or less minimized by the fact that the artist in question, Maurice Prendergast, is known to be an American painter particularly noted for his landscaped views of areas in the states of Massachusetts and New York. (See The New International Encyclopedia, 1920 edition, volume 19, page 173, wherein the artist in question is identified as Morris Brazil Prendergast.)

We cannot say that in painting "Central Park" the artist relied more heavily upon his imagination than he did upon the physical aspects of the scene from which he drew his inspiration. We are certain, however, that the view which appears in plaintiff's exhibit 3 was not produced almost entirely from the imagination of the artist.

We hold, therefore, that the merchandise of which exhibits 1 and 3 are representative, which are invoiced as "Kent: Winter," and "Prendergast: Centralpark," respectively, consists of such views of American scenes as are expressly excluded from the provisions of paragraph 1406, *supra*. The collector's action in classifying said

merchandise at 35 per centum ad valorem pursuant to the provisions of paragraph 1413 of said act is therefore sustained and the claim in the protest with respect thereto is overruled.

As the merchandise represented by exhibit 2, and invoiced as "Marin: Maine Islands," does not consist of views of American scenes, it is properly dutiable at the rate of 30 cents per pound, as provided for in said paragraph 1406, as lithographed articles not exceeding twelve one-thousandths of an inch in thickness.

Judgment will be entered in accordance with our decision herein.